[Cite as *MCM Home Builders, L.L.C. v. Sheehan*, 2019-Ohio-3899.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT


MCM HOME BUILDERS, LLC : JUDGES:
:
: Hon. W. Scott Gwin, P.J.
Plaintiff-Appellee : Hon. John W. Wise, J.
: Hon. Patricia A. Delaney, J.
-vs- :
: Case No. 18 CAE 09 0074
:
MARK R. SHEEHAN, ET AL. :
:
:
Defendants-Appellants : O P I N I O N


CHARACTER OF PROCEEDING: Appeal from the Delaware County Court
of Common Pleas, Case No. 16CVH-01-
67



JUDGMENT: AFFIRMED



DATE OF JUDGMENT ENTRY: September 25, 2019



APPEARANCES:

For Plaintiff-Appellee: For Defendants-Appellants:

RICHARD T. RICKETTS DAVID A. GOLDSTEIN
ANDREW C. CLARK 511 South High St., Suite 200
50 Hill Road South Columbus, OH 43215
Pickerington, OH 43147

*Delaney, J.*

{¶1} Defendants-Appellants Mark R. Sheehan, Co-Trustee of the 9238 Deer Path Court Trust dated August 31, 2013 and Tammy M. Johnson, Co-Trustee of the 9238 Deer Path Court Trust dated August 31, 2013 appeal the February 1, 2018 jury verdict and September 6, 2018 judgment entry of the Delaware County Court of Common Pleas.

## FACTS AND PROCEDURAL HISTORY

### The Cost-Plus Contract

{¶2} On August 31, 2013, Defendants-Appellants Mark R. Sheehan, Co-Trustee of the 9238 Deer Path Court Trust dated August 31, 2013 and Tammy M. Johnson (aka Tammy Sheehan), Co-Trustee of the 9238 Deer Path Court Trust dated August 31, 2013 entered into a contract with Plaintiff-Appellee MCM Home Builders, LLC for the construction of a 4988 square foot home located in Powell, Ohio. MCM, wholly owned and operated by Marc Moldovan, was the general contractor, and construction on the home was to be completed by subcontractors. An attorney reviewed the construction contract on behalf of the Sheehans prior to entering the contract. At the time of the contract, the Sheehans were executives at Huntington National Bank.

{¶3} The parties set the budget for the home construction at $499,235.00. The construction contract was known as a "cost-plus contract" wherein the payment terms of the contract stated as follows:

> In consideration of the performance of the Contract, the Buyer agrees to
> pay the Builder a Ten Percent (10%) Builder fee based upon the Budget for
> the Project of $499,235.00. Draws will be paid to Builder as determined by
> the Buyer's Lender. Buyer and Builder shall cooperate in delivering any

document reasonably required by the Buyer's Lender in order to receive draws. If permitted by Buyer's Lender, each draw shall include a 10% fee for the Builder.

{¶4} In a fixed fee contract, the builder provides the house plans to the customer. The customer usually has limited choices between the levels of finishes, but the total price of the construction is fixed. Within the fixed price of the home construction, the builder has included his or her profit margin. If the customer desires to make a change during construction, the customer would complete a change order for which the customer would immediately pay for any overage outside of the fixed price. In a cost-plus contract, typically used in custom-built homes, the builder takes the house plans, bids out each phase of the construction, and establishes a construction budget dependent on the totality of the bids. Allowances are put in place for the selection features in each phase. The vendor invoices come directly to the builder. A cost-plus contract allows the customer flexibility to change plans during construction. If the customer makes a change that comes under the budget for that phase, the customer receives a credit. If the customer makes a change that goes over budget for that phase, the customer is responsible for the overage. At the end of construction, the builder determines the costs of construction guided by the original budget and then charges a 10% builder's fee.

{¶5} In the parties' cost-plus contract, MCM's responsibilities as Builder were stated as follows:

Builder's Services

2.1 Services. The Builder will perform the following services under this Agreement in each of the two phases described below:

(a) <u>Design Phase</u>.

\*\*\*

(iii) <u>Project Construction Budget</u>. Prepare a Project budget as soon as major Project requirements have been identified, and update periodically for the Buyer's approval. Prepare an estimate based on Construction Drawings for approval by the Buyer as the Project Construction Budget. Update and refine this estimate for the Buyer's approval as the development of the Drawings and Specifications proceeds, and advise the Buyer and the Architect/Engineer if it appears that the Project Construction Budget will not be met and make recommendations for corrective action;

\*\*\*

(b) <u>Construction Phase</u>.

\*\*\*

(ii) <u>Cost Control</u>. Develop and monitor an effective system of Project cost control and negotiate the best price possible for the Buyer. Revise and refine the initially approved Project Construction Budget, incorporate approved changes as they occur, and develop cash flow reports and forecasts as needed. Identify variances between actual and budgeted or estimated costs and advise Buyer and Architect/Engineer whenever projected cost exceeds budgets or estimates. Maintain cost accounting records on authorized Work performed under unit costs, actual costs for labor and material, or other bases requiring accounting records.

(iii) <u>Workmanlike Manner</u>. All work shall be performed in a Workmanlike Manner, conforming to the standards set forth by the Ohio Home Builders Association and published on their website.

* * *

{¶6} The cost-plus contract included terms as to the Builder's Fee:

EXCESS COSTS

IF AT ANY TIME A HOME CONSTRUCTION SERVICE REQUIRES EXTRA COSTS ABOVE THE COST SPECIFIED OR ESTIMATED IN THE CONTRACT THAT WERE REASONABLY UNFORESEEN, BUT NECESSARY, AND THE TOTAL OF ALL EXTRA COSTS TO DATE EXCEED FIVE THOUSAND DOLLARS OVER THE COURSE OF THE ENTIRE HOME CONSTRUCTION CONTRACT, YOU HAVE THE RIGHT TO AN ESTIMATE OF THOSE EXCESS COSTS BEFORE THE HOME CONSTRUCTION SERVICE SUPPLIER BEGINS WORK RELATED TO THOSE COSTS.

The estimated additional costs shall be set forth in writing and shall require the written agreement of all affected parties. In the event that they Buyer does not consent to the excess costs, either Buyer or Builder shall have the right to terminate the Contract upon 10 days written notice to the other. In the event of such termination, the Buyer shall pay the Builder for all work performed to that point, however, Buyer shall not owe for any Non-Conforming Work as defined above, Builder's profit and/or overhead for

work not performed or related to Non-Conforming Work, or work yet to be performed. This amount shall be liquidated damages. * * *

{¶7}   In case of termination, the cost-plus contract provided as follows:

10.2 <u>Buyer's Right to Perform Builder's Obligations and Termination by the Buyer for Cause</u>. If the Builder fails to perform any of his obligations under this Agreement, the Buyer may, after seven (7) days' written notice during which periods the Builder fails to perform such obligation, make good such deficiencies and terminate this contract. In the event of such termination, the Buyer shall pay the Builder for work performed to that point, however, Buyer shall not owe for any Non-Conforming Work as defined above, Builder's profit and/or overhead for work not performed or related to Non-Conforming Work, or work yet to be performed. This amount shall be liquidated damages. Such payment by Buyer shall constitute a full release of any future financial liability on the part of the Buyer to the Builder.

* * *

10.4 <u>Termination by Buyer without Cause</u>. In the event that Buyer terminates this Agreement without cause, that is without failure of the Builder, Architect, Engineer, Subcontractors, the Buyer shall pay the Builder for all work performed to that point, however Buyer shall not owe for any Non-Conforming Work as defined above, Builder's profit and/or overhead for work not performed or related to Non-Conforming Work, or work yet to be performed. In addition, Buyer shall pay a termination fee in the amount of $5,000. This amount shall be liquidated damages. Such payment by

Buyer shall constitute a full release of any future financial liability on the part

of the Buyer to the Builder.

## Construction

{¶8}   Construction of the home began on October 15, 2013. The Sheehans used their own architect to develop plans for the home. Tammy Sheehan was actively involved in the design of the home and selecting the finishes in the home. During the construction of the home, the Sheehans made changes to the original plans, some planned and some unplanned. One change was based on an issue with the roof line. According to the Sheehans and the architect, MCM read the plans incorrectly and misaligned the roof line. Instead of requesting MCM to tear down the framing, the Sheehans chose to move forward and requested a change in the roof line that required more framing and drywall because it increased the size of a bathroom. Other changes during construction were made at the specific request of the Sheehans, such as upgraded kitchen cabinets, granite countertops, upgraded windows, upgraded stairs, a theater room, 18 different paint colors, and a four-season room. The Sheehans met with the vendors directly to select the upgraded items and discussed the costs for the upgrades. The invoices for the upgrades, which included cost and installation, were sent to MCM. The changes made by the Sheehans during construction went over the original budget for those items. Other items, such as landscaping, went under the original budget.

{¶9}   The Sheehans and MCM communicated through email, text, and phone calls. The Sheehans met with Marc Moldovan at the construction site at least once a week. The Sheehans stated that at no time during construction did MCM tell them that construction was over budget. The Sheehans did not review any invoices nor did they

request to review the invoices. Moldovan was MCM's only employee and he maintained the construction budget and invoices with an Excel spreadsheet.

{¶10} The Sheehans obtained financing from the First Community Bank for $512,000 from which MCM would receive construction draws based on the percentage of the work completed. MCM worked with First Community Bank to obtain the construction draws during the building process. In order to obtain the draws, First Community Bank would inspect the construction and release the funds if it met their inspection standards. First Community Bank also required MCM to provide subcontractor waivers of liens before it would release the draws. MCM stated this process was unusual because MCM did not have a pre-existing balance to pay the subcontractors. It used the construction draw to pay the subcontractors, who could then verify they had been paid through a waiver of lien. In order to meet the bank's requirements, MCM got permission from some subcontractors to sign their name to the waiver of lien. During construction, no subcontractor filed a mechanic's lien. MCM drew the entire construction loan of $512,000.

### Construction Completion

{¶11} The City of Delaware issued a Certificate of Occupancy on August 29, 2014.

{¶12} In September 2014, the Sheehans compiled their first punch list of items to be fixed after construction. The Sheehans were not satisfied with MCM's completion of the punch list.

{¶13} In November 2014, MCM presented the Sheehans with a revised budget that showed $70,000 remained due and owing on the construction of the home. The Sheehans were unaware that construction had allegedly went over budget.

{¶14} On December 2, 2014, the Sheehans presented MCM with their second punch list. The Sheehans felt when MCM worked on the punch list, it created more problems than it fixed. One example was the dishwasher was not balanced after it was installed. MCM adjusted the height of the dishwasher but it allegedly broke the granite countertop because it raised the dishwasher too high.

{¶15} On January 5, 2015, Mark Sheehan sent MCM an email that stated the Sheehans were dissatisfied with how MCM was addressing the punch list. Mark Sheehan told MCM not to return to the home.

{¶16} In February 2015, a subcontractor replaced the garage doors pursuant to the punch list.

{¶17} On March 19, 2015, MCM filed a mechanic's lien stating that the Sheehans owed $66,205.70. The mechanic's lien further stated the last day of work on the home was February 27, 2015.

**Civil Complaint**

{¶18} On January 22, 2016, MCM filed a complaint against the Sheehans in the Delaware County Court of Common Pleas. In its complaint, it alleged causes of action for breach of contract, promissory estoppel, and unjust enrichment. MCM requested damages in the amount of $130,987.22, the remaining balance from the construction of the home alleged to be owed by the Sheehans.

{¶19} The Sheehans filed an answer and counterclaim on March 7, 2016. In its counterclaim, the Sheehans alleged breach of contract, negligence, fraud, and violations of the Home Construction Service Supplies Act. They requested compensatory damages, punitive damages, and attorney's fees.

{¶20} On May 15, 2017, MCM filed a partial motion for summary judgment requesting judgment as a matter of law on the Sheehans' claims for negligence, fraud, and the Home Construction Service Supplies Act. On October 12, 2017, the trial court granted the motion for summary judgment in part as to negligence and fraud but allowed the claim for a violation of R.C. 4722.03(A)(3)(d).

{¶21} On May 16, 2017, MCM filed a motion for leave to file a first amended complaint. It moved to add causes of action for bad faith/willful and wanton breach of contract and abuse of process. MCM contended that during the discovery process, it determined that of the $125,000 alleged to be owed by the Sheehans, $120,000 of those amounts were approved by the Sheehans and the basis of the Sheehans refusal to pay those amounts were due to the failure to sign a written change order. MCM claimed abuse of process because the Sheehans filed a criminal complaint against Moldovan with the Delaware County Sheriff's Department. The trial court denied the motion on October 12, 2017. The trial court first found the motion for leave to file an amended complaint was not timely filed under Civ.R. 15(A). The trial court next found MCM failed to establish a prima facie case to support its claim for the addition of the tort of bad faith breach of contract and the recovery of punitive damages. It further found the criminal complaint filed by the Sheehans did not meet the standard for an abuse of process claim.

**Trial**

{¶22} Prior to the jury trial, MCM filed a motion in limine to bar the Sheehans from presenting any trial testimony from undisclosed or insufficiently disclosed witnesses. MCM argued the Sheehans should not be permitted to call Al Galko as an expert witness because the Sheehans did not provide MCM with a description of Galko's qualifications

or summary of his expected testimony in accordance with Loc.R. 26.03(C) of the Delaware County Court of Common Pleas, General Division. The trial court granted the motion in limine on January 17, 2018. The trial court further denied the Sheehans' motion to substitute an expert witness. At trial, the Sheehans proffered Galko's testimony. (T. 22-23).

{¶23} Prior to voir dire, the trial court inquired as to bad faith:

THE COURT: * * * And I was also wondering last night, are both parties claiming that the other party breached the contract in bad faith and so is each party seeking attorney fees for that alleged bad faith breach? It was not clear.

ATTORNEY FOR PLAINTIFF: Your Honor, I believe the only parties that have pled bad faith are the Plaintiffs. I do not believe it has been pled by the Defendants.

THE COURT: I see. Is that correct from the Defendant's perspective?

ATTORNEY FOR DEFENDANTS: That's correct. We don't believe there's bad faith on either side.

THE COURT: I see. Do the parties have any thoughts on the whether the issue of this alleged bad faith breach is something that goes to the jury or rather instead something it's something I would decide? Obviously I would assume everybody would think I would decide the amount, if any, of the attorney fees. But is the jury the entity that is to decide whether or not there was bad faith by the Defendants in a breach, if any?

* * *

ATTORNEY FOR PLAINTIFF: Yes, Your Honor. So the way that we had structured the proposed jury instructions and verdict forms was to ask the jury to determine whether they found bad faith and, if so, then it would move the issue of the amount of those attorneys fees to Your Honor.

THE COURT: I see. Any contrary thoughts, defense?

ATTORNEY FOR DEFENDANTS: No, Your Honor. Just as long as I think we're clear that obviously the jury does not determine the amount of fees, that's something we have in a separate hearing.

(T. 16-18).

{¶24} The causes of action before the jury were MCM's claims for breach of contract and the Sheehans' claims for breach of contract and violations of the Home Construction Service Suppliers Act. MCM alleged the total actual cost of construction on the 5000 square foot home was $574,866.23. The ten-percent builder fee was $57,486.60 so the total amount due from the Sheehans was $632,352.85. MCM claimed it had been paid $507,400 so it was due $124,952.85. At the close of MCM's case, the Sheehans moved for a directed verdict on its claims for promissory estoppel and unjust enrichment. The trial court granted the motion.

{¶25} The jury was provided with instructions and interrogatories. Interrogatory No. 1 asked whether MCM proved by a preponderance of the evidence that the Sheehans breached the written contract. The jury answered in the affirmative. The jury stated in Interrogatory No. 2 that the Sheehans breached the contract on January 5, 2015. In Interrogatory No. 3, the jury awarded MCM $124,868.85 in compensatory damages and $5,000 in damages pursuant to Section 10.4 of the contract. The jury answered

affirmatively in Interrogatory No. 4 that the Sheehans' conduct in breaching the contract was in bad faith or was vexatious, wanton, obdurate, or malicious. In Interrogatory No. 5, the jury did not find that the Sheehans proved by the preponderance of the evidence that MCM breached the written contract. The jury further found in Interrogatory No. 8 that the Sheehans did not prove by a preponderance of the evidence that MCM violated the Home Construction Service Suppliers Act. The jury finally found, in Interrogatory No. 11, the Sheehans' claim under the HCSSA was not pursued in bad faith.

### Attorney's Fees

{¶26} After the jury's verdict, MCM moved for attorney's fees. The trial court held a hearing on August 24, 2018 to determine if the Sheehans should be required to pay attorney's fees pursuant to the American Rule and if so, what amount.

{¶27} On September 6, 2018, the trial court issued its judgment entry finding that MCM was entitled to attorney's fees and the amount of reasonable attorney's fees and expenses to be awarded was $221,452.88.

{¶28} It is from these judgments the Sheehans now appeal.

### ASSIGNMENTS OF ERROR

{¶29} The Sheehans raise six Assignments of Error:

{¶30} "I. THE TRIAL COURT ERRED BY ALLOWING HEARSAY EVIDENCE AS IT RELATED TO TESTIMONY OF MARC MOLDOVAN AND APPELLEE'S EXHIBIT 12.

{¶31} "II. THE TRIAL COURT ERRED BY ALLOWING BAD FAITH TO PROCEED IN THE CASE AND PRESENT TO A JURY.

{¶32} "III. THE VERDICT AS IT RELATED TO THE BAD FAITH CLAIM WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶33} "IV. THE TRIAL COURT ERRED BY AWARDING APPELLEE ATTORNEY'S FEES.

{¶34} "V. THE VERDICT THAT APPELLEE DID NOT BREACH THE CONTRACT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶35} "VI. THE TRIAL COURT ERRED BY PRECLUDING APPELLANTS' EXPERT FROM TESTIFYING."

## ANALYSIS

## I. EVIDENTIARY ISSUES

### A. Hearsay and Exhibit 12

{¶36} The Sheehans contend in their first Assignment of Error that the trial court abused its discretion when it overruled their objection and permitted Moldovan to testify as to Exhibit 12, invoices submitted by the subcontractors to MCM for the construction of the home, as a business record exception to the hearsay rule. The Sheehans argue Exhibit 12 was inadmissible hearsay that did not conform to any hearsay exception.

{¶37} "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Huth v. Kus*, 5th Dist. No. 2017 AP 06 0015, 2018-Ohio-1931, 113 N.E.3d 140, 2018 WL 2230727, ¶ 30 quoting *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is generally not admissible unless it falls within one of the recognized exceptions. Evid.R. 802; *State v. Steffen*, 31 Ohio St.3d 111, 119, 509 N.E.2d 383 (1987). Evidence Rule 803(6) provides that records of

regularly conducted business activity are admissible, as an exception to the rules of hearsay, if shown to be such "by the testimony of the custodian or other qualified witness." The question of what may lay a foundation for the admissibility of business records as a custodian or other qualified witness must be answered broadly. *Carrington Mtge. Services, LLC v. Shepherd*, 5th Dist. Tuscarawas No. 2016 AP 07 0038, 2017-Ohio-868, 2017 WL 951320, ¶ 29 citing *Citimortgage v. Cathcart*, 5th Dist. Stark No. 2013CA00179, 2014–Ohio–620. It is not a requirement that the witness have firsthand knowledge of the transaction giving rise to the business record. *Id.* "Rather, it must be demonstrated that: the witness is sufficiently familiar with operation of the business and with the circumstances of the record's preparation, maintenance and retrieval, that he can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Rule 803(6)." *Id.*

{¶38} "Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion. *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). However, "[w]hether evidence is admissible because it falls within an exception to the hearsay rule is a question of law, thus, our review is de novo." *State v. Truitt*, 9th Dist. No. 25527, 2011-Ohio-6599, 2011 WL 6749811, ¶ 24 (quoting *Monroe v. Steen*, 9th Dist. No. 24342, 2009-Ohio-5163, 2009 WL 3119693, ¶ 11.

{¶39} MCM's claims arose from the Sheehans' alleged failure to pay under the cost-plus contract. In its case in chief, MCM called Moldovan to testify as to the work performed and the monies owed. To support his testimony, MCM presented Exhibit 11, which was an Excel spreadsheet used to come up with the initial construction budget for

the Sheehans' home. (T. 253). Moldovan testified he utilized a spreadsheet budget in all his construction projects and maintained the spreadsheet in the ordinary course of his business. (T. 253). Moldovan, as the only employee of MCM, received the invoices from subcontractors and entered that information into the spreadsheet. (T. 253). Column D of the spreadsheet represented the actual budget; columns E through F of the spreadsheet were the costs as reflected by the invoices. (T. 255). The Sheehans objected to the Moldovan's testimony and Exhibit 11 on the basis of hearsay. (T. 255). They argued while MCM was attempting to present the spreadsheet as a business record based on invoices provided by third parties, Exhibit 11 was hearsay within hearsay. MCM responded that pursuant to the case law regarding a cost-plus contract, MCM must establish it was invoiced and paid those amounts, but it was not its burden to establish the contents of the invoices. In order to support Exhibit 11, MCM intended to present Exhibit 12, the invoices referred to in the spreadsheet. (T. 256-257). The trial court overruled the objection as to Exhibit 11 and ordered MCM to establish it was a business record. (T. 258-259). During Moldovan's testimony regarding his process for receiving invoices and entering them into the spreadsheet, the trial court requested MCM to inquire further into Moldovan's personal knowledge of the information he received on the bills or invoices, how Moldovan knew the invoice was a legitimate bill that went with the project, and when was the spreadsheet created. (T. 262, 266, 275).

{¶40} After Moldovan's testimony regarding Exhibit 11, MCM introduced Exhibit 12, which were the invoices and/or cancelled checks for the Sheehans' home construction and used to create Exhibit 11, the spreadsheet. (T. 278). The Sheehans objected to the

introduction of Exhibit 12 on the basis of hearsay. (T. 278). During Moldovan's testimony, the trial court addressed the jury:

> You're instructed as Mr. Clark shows you these bills from different companies that we don't actually know that the bills themselves are accurate. These are prepared by other companies, not evidently by Mr. Moldovan, but by American Air Heating and Cooling and other businesses not affiliated with any of the parties in this case. Whoever created those bills is not here and is not being cross-examined at least at this point, so the Defendants have no way to test the accuracy of what you've seen on these couple of bills that have been shown on the screen. You therefore cannot accept as true the information on those bills, that is you cannot just accept the fact that the work listed on these bills was in fact done on the Sheehan home by the billing entity. What I will allow you to do though is to consider those bills as evidence that MCM was billed the amounts that are listed on those bills, and you may consider Mr. Moldovan's testimony about his receipt of the bills and his testimony about what he did with those bills. But again, the actual information on the bills prepared by somebody who's not here to testify is considered hearsay. So you may consider those bills for the limited purpose of considering what Mr. Moldovan, this witness who is subject to cross-examination, received and how he handled the information that was listed on these bills that he received.

(T. 282-283).

{¶41} At the close of MCM's case, MCM moved to admit Exhibits 11 and 12. (T. 1005). The Sheehans objected on the basis of hearsay. The trial court stated, "Well, it is a proper hearsay objection, I'll sustain it. It might well be helpful to the jury to see those, but the information in there is an out of court statement presumably offered for the truth so I don't feel I can let the jury have Exhibit 12." (T. 1005). MCM responded:

> Your Honor, I do have a case with regard to that particular concept as to, as to the fact that invoices are permitted as long as a limiting instruction is given. And, in this case, Your Honor, we're not, we're not admitting them to prove the truth of the substance of the invoices. We're admitting them to show that is what Mr., that is what MCM Homes was invoiced, and I think that's an important distinction in this case because we have a burden under the cost-plus contract to show what he was invoiced, what the actual cost was. So if there are issues with the invoices as to their completeness, their accuracy, or whether they relate to this project, I think that under the cost-plus standard shifts to the Defendants to present those challenges.

(T. 1005-1006).

{¶42} The trial court considered the arguments and admitted Exhibit 12 under the business record exception and gave the jury a limiting instruction:

> And I did want to remind you what I had earlier told you about some of these exhibits that we saw during the course of the trial – some of which you will have with you during your deliberations – where some of that information was prepared by people who were not here to testify and not here to be cross-examined during the trial. A good example is that lengthy Plaintiff's

Exhibit 12, the bills from a number of these subcontractors, * * * So as I indicated to you earlier and now remind you, we don't know that the bills themselves are accurate. Whoever created those bills was not here and was not available for cross-examination during the trial. You, therefore, cannot accept as true the information on the bills, that is that the work listed on them was in fact done on the Sheehan home by the billing entity. You can consider those bills, those exhibits, however, as evidence of what the parties who did testify and who were cross-examination, or were cross-examined did with those items. So it could be considered by you as evidence that MCM was billed particular amounts that are listed and you might consider how for instance Mr. Moldovan behaved after receiving those items and what he did with them as well as how the Sheehans responded when they saw any of those items.

(T. 1602-1603).

{¶43} This case involves the alleged breach of a cost-plus contract. In *Burton v. Durkee*, 158 Ohio St. 313, 109 N.E.2d 265 (1952) ("*Burton I*" ) and *Burton v. Durkee*, 162 Ohio St. 433, 123 N.E.2d 432 (1954) ("*Burton II*"), the Ohio Supreme Court established the evidentiary burdens for recovery in a cost-plus contract.

{¶44} *Burton I* involved a dispute over the amount due the plaintiff for a house constructed on a cost-plus contract. The defendant argued that a builder can only recover the proven reasonable cost of his labor and material. The Ohio Supreme Court held that the language of the contract was clear and unambiguous and payment was to be the cost

of all materials, labor, permits, taxes, insurance and all other costs and expenses incurred directly in the work plus a fixed fee. 158 Ohio St. at 326, 109 N.E.2d 265.

{¶45} After retrial, the case returned to the Supreme Court in *Burton II*. The trial court gave the following instruction to the jury without objection from the parties:

Now in this case, * * * we have not only the general law but the law of this case, and it has been fixed by the Supreme Court of the state of Ohio after a full and complete review. This case has been sent back by them for trial and the unanimous opinion of the Supreme Court of Ohio is that we are dealing with a cost-plus contract, not a fixed contract. The contractor * * * is entitled to recover * * * the amount of his unpaid costs, inclusive of fee and compensation, as hereinbefore indicated, $2,700 * * * and of the amount, if any-and you are to deduct also the amount, if any, of any lawfully compensable damages which the defendants may have suffered by reason of any malfeasance, extravagance, wastefulness or negligence upon the part of * * * plaintiff in the prosecution of said work, or failure to proceed therewith with reasonable dispatch and due diligence.

Now then, the question you have to decide is this: Has the defendant Durkee, have the defendants, the Durkees, established by a preponderance of the evidence, any wastefulness, malfeasance and negligence or failure to proceed with reasonable dispatch and due diligence upon the part of this contractor. We say they must establish it by a preponderance of the evidence; negligence, malfeasance and any wrong doing is not

presumable; it must be proven, and of course the defendant has that burden

* * *.

162 Ohio St. at 440, 123 N.E.2d 432.

{¶46} The defendant maintained that the burden was on the plaintiff to show reasonable cost. The Supreme Court held that under the contract, the builder was not bound by reasonable cost but was entitled to actual costs, and the burden of proof is upon the owners to show that the costs were erroneous or false. *Burton II* at 442–443, 123 N.E.2d 432. There is no established principle in the law that one who contracts to do certain work for another must disprove his default as a part of his affirmative case for compensation. *Id.* at 443, 123 N.E.2d 432. Honesty, good faith and performance of duty are presumed, while fraud and negligence are not presumed. *Id.* "If and when the owners produce evidence of such character as to raise a presumption of negligence or default on the part of the builder, the latter will be required only to produce evidence sufficient to balance the state of proof." *Id.*, citing *Tresise v. Ashdown*, 118 Ohio St. 307, 160 N.E. 898. See also, *Mid-Ohio Mechanical v. Eisenmann Corp.*, 5th Dist. Guernsey No. 07 CA 000035, 2009-Ohio-5804, 2009 WL 3633846, ¶ 58.

{¶47} Exhibit 12 contained the invoices and cancelled checks received by MCM for the construction of the Sheehans' home. MCM presented Exhibit 12 to the jury pursuant to the evidentiary framework established in *Burton I* and *Burton II* to demonstrate MCM received the invoices and based on those invoices, what it perceived to be the actual costs of the project. It was the burden of the Sheehans to show the costs were erroneous or false. *See Burton I* and *Burton II, supra*. In this case, we find no error for the

trial court to overrule the Sheehans' objections as to the admissibility of Exhibit 12 under the evidentiary framework of *Burton I* and *Burton II*.

{¶48} The trial court in this case also gave the jury multiple limiting instructions as to the weight they should give Exhibit 12 during their deliberations. The jury is presumed to follow the instructions of the trial court. *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), paragraph four of the syllabus. The jury heard the testimony of Moldovan and was able to weigh his credibility as to his creation of Exhibit 11, the spreadsheet, based on the invoices he received, Exhibit 12. The jury was aware that Moldovan was the sole keeper and creator of the business records for MCM.  In this case, the jury found Moldovan to be credible.

{¶49} We find no error to permit the admission of Exhibit 12 pursuant to the business record exception and the *Burton* cost-plus contract evidentiary framework. The Sheehans' first Assignment of Error is overruled.

## B. Motion in Limine and Expert Witness

{¶50} In their sixth Assignment of Error, the Sheehans argue the trial court abused its discretion when it granted MCM's motion in limine to exclude the Sheehan's expert witness and to prohibit the Sheehans from substituting an expert witness. We disagree.

{¶51} "A motion in limine is a motion directed to the inherent discretion of the trial court judge to prevent the injection of prejudicial, irrelevant, inadmissible matters into trial." *State v. Strait*, 5th Dist. Delaware No. 14 CAA 12 0081, 2015-Ohio-4264, 2015 WL 5968655, ¶ 24 quoting *Mason v. Swartz*, 76 Ohio App.3d 43, 55, 600 N.E.2d 1121 (6th Dist.1991). "Generally, the grant or denial of such a motion is not a ruling on the evidence." *Mason, supra* at 55. It is a preliminary interlocutory order and the party's

objection must be raised again at trial in order to permit the court to consider the admissibility of the evidence in its actual context. *Id.*

{¶52} The granting or denying a motion in limine are reviewed under an abuse of discretion standard of review. *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013–Ohio–1507. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Huth v. Kus*, 5th Dist. No. 2017 AP 06 0015, 2018-Ohio-1931, 113 N.E.3d 140, 2018 WL 2230727, ¶ 30 quoting *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).

{¶53} MCM filed a motion in limine to preclude the testimony of the Sheehans' expert witness, Al Galko, for the Sheehans failure to comply with Delaware Loc. R. 26.03 to provide MCM with a description of Galko's qualifications or summary of his expected testimony. The Sheehans responded that they provided Galko's name as a potential witness. On January 17, 2018, the trial court granted the motion in limine for the Sheehans failure to comply with Delaware Loc.R. 26.03 and its discovery deadlines. The trial court further denied the Sheehans' motion to substitute a new expert witness because the Sheehans sought to substitute witnesses 11 days before trial.

{¶54} The Sheehans raised the issue of their expert at trial and proffered his testimony. (T. 22-23).

{¶55} Loc.R. 26.03(A) of the Delaware County Court of Common Pleas, General Division requires a party to disclose the "name, address, and business phone number" for all witnesses. Delaware Loc.R. 26.03(C) requires "[a] brief description of the expert's qualifications and summary of the expert's opinion and the basis and theory of that opinion." There is no dispute that the Sheehans failed to provide this information to MCM pursuant to the Local Rules and did not follow the trial court's pretrial discovery order deadlines.

{¶56} We find no abuse of discretion for the trial court to grant MCM's motion in limine to exclude the Sheehan's expert witness and to deny their motion to substitute witnesses.

{¶57} The Sheehans' sixth Assignment of Error is overruled.

### III. BAD FAITH

### A. Unpled Claim

{¶58} The Sheehans contend in their second Assignment of Error that the trial court erred when it permitted MCM to pursue its claim for bad faith, after the trial court previously denied MCM's motion to amend its complaint to add a cause of action for bad faith. We disagree.

{¶59} On May 16, 2017, MCM filed a motion for leave to file a first amended complaint. It moved to add causes of action for bad faith/willful and wanton breach of contract and abuse of process. MCM contended that during the discovery process, it determined that of the $125,000 alleged to be owed by the Sheehans, $120,000 of those amounts were approved by the Sheehans and the basis of the Sheehans' refusal to pay those amounts were due to the failure to sign a written change order.

{¶60} The trial court denied the motion on October 12, 2017. The trial court found the motion for leave to file an amended complaint was not timely filed under Civ.R. 15(A). The trial court next found MCM failed to establish a prima facie showing that it could marshal support for the new matter it sought to plead. The trial court found in an attempt to collect punitive damages, MCM sought to add the claim for bad faith, willful, wanton breach of contract. Punitive damages were not generally recoverable in a breach of contract unless the breaching conduct also constituted a tort, for which punitive damages were recoverable. The trial court found MCM did not present evidence to support its claim for a willful breach of contract that would justify damages beyond ordinary damages available in a breach of contract claim. Further, MCM did not allege a special or fiduciary relationship between it and the Sheehans to impose a duty of good faith in a contractual agreement.

{¶61} Prior to voir dire, the trial court inquired as to bad faith:

THE COURT: * * * And I was also wondering last night, are both parties claiming that the other party breached the contract in bad faith and so is each party seeking attorney fees for that alleged bad faith breach? It was not clear.

ATTORNEY FOR PLAINTIFF: Your Honor, I believe the only parties that have pled bad faith are the Plaintiffs. I do not believe it has been pled by the Defendants.

THE COURT: I see. Is that correct from the Defendant's perspective?

ATTORNEY FOR DEFENDANTS: That's correct. We don't believe there's bad faith on either side.

THE COURT: I see. Do the parties have any thoughts on the whether the issue of this alleged bad faith breach is something that goes to the jury or rather instead something it's something I would decide? Obviously I would assume everybody would think I would decide the amount, if any, of the attorney fees. But is the jury the entity that is to decide whether or not there was bad faith by the Defendants in a breach, if any?

* * *

ATTORNEY FOR PLAINTIFF: Yes, Your Honor. So the way that we had structured the proposed jury instructions and verdict forms was to ask the jury to determine whether they found bad faith and, if so, then it would move the issue of the amount of those attorneys fees to Your Honor.

THE COURT: I see. Any contrary thoughts, defense?

ATTORNEY FOR DEFENDANTS: No, Your Honor. Just as long as I think we're clear that obviously the jury does not determine the amount of fees, that's something we have in a separate hearing.

(T. 16-18).

{¶62} The proposed jury instructions submitted by MCM during the trial included bad faith instructions. The Sheehans do not cite to the record where they objected to the inclusion of bad faith instructions in the jury instructions.

{¶63} Ohio courts follow the "American rule," which provides in a breach of contract case each party is responsible for their own attorney fees except as otherwise provided for by statute or contract or when the opposing party acted in bad faith, vexatiously, wantonly, obdurately, for malicious reasons, or otherwise engaged in

malicious conduct." *Strategy Group for Media, Inc. v. Lowden*, 5th Dist. Delaware No. 12 CAE 03 0016, 2013-Ohio-1330, ¶ 55, citing *Stambaugh v. T.C. Wood Realty, Inc.*, 5th Dist. Morrow No. 09 CA 00008, 2010-Ohio-3763, ¶ 36.

{¶64} In this case, both parties alleged breach of contract. Upon review of the record in this case, we do not find the trial court was allowing MCM to assert a cause of action for a tort-based breach of contract, wherein MCM could recover punitive damages. In Ohio, "public policy dictates that every contract contain an implied duty for parties to act in good faith and to deal fairly with each other." *Gator Dev. Corp. v. VHH, Ltd.*, 1st Dist. Hamilton No. C-080193, 2009-Ohio-1802, 2009 WL 1027584, ¶ 24. This implied duty does not supplant express contract terms. *Id.* Ohio, however, does not recognize the bad-faith breach of a contract as a tort claim, outside the context of an insurance dispute, which was the basis for the trial court's denial of MCM's motion to amend its complaint. *Id.* The trial court was instructing the jury as to the exception to the "American Rule," that allows a prevailing party to recover its attorney's fees if there is a finding of bad faith. (T. 1617).

{¶65} We further find that the discussion with the trial court and counsel for the Sheehans was not an objection to the trial court's inclusion of bad faith but a statement by counsel that the Sheehans did not allege bad faith and there was no evidence of bad faith on either side to permit an exception to the American Rule. A party waives and may not raise on appeal any error which arises during the trial court proceedings if that party fails to bring the error to the court's attention, by objection or otherwise, at a time when the trial court could avoid or correct the error. *Lowder v. Domingo*, 5th Dist. Stark No. 2016CA00043, 2017-Ohio-1241, 2017 WL 1231724, ¶ 21 citing *Goldfuss v. Davidson*, 79

Ohio St.3d 116, 121–123, 679 N.E.2d 1099 (1997). A failure to object at trial waives all but plain error. *Id.* The plain error doctrine is applicable in civil cases only where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process." *Id.* at syllabus. This issue does not meet the plain error standard.

{¶66} The Sheehans' second Assignment of Error is overruled.

### B. Manifest Weight – Bad Faith

{¶67} In their third Assignment of Error, the Sheehans contend the jury's finding that the Sheehans engaged in bad faith when they breached the contract was against the manifest weight of the evidence.

{¶68} As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. *Vanbuskirk v. Gibson*, 5th Dist. Richland No. 2018 CA 0133, 2019-Ohio-3353, 2019 WL 3946065, ¶ 23. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA–5758, 1982 WL 2911. Generally, a civil judgment which is supported by competent and credible evidence may not be reversed as being against the manifest weight of the evidence. *See State v. McGill*, 5th Dist. Fairfield No.2004–CA–72, 2005–Ohio–2278, 2005 WL 1092394, ¶ 18. A reviewing court must determine whether the finder of fact, in resolving conflicts in the evidence, clearly lost his or her way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *See Hunter v. Green*, 5th Dist. Coshocton No. 12–CA–2, 2012–Ohio–5801, 2012 WL 6094172, ¶ 25, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 972 N.E.2d 517, 2012–Ohio–2179.

{¶69} The jury was instructed as follows:

MCM also asks that the Sheehans be required to pay the fees of the attorneys that MCM has hired to represent it in this case.

Under Ohio law, a party seeking to recover damages for an alleged breach of contract committed by the other party is generally not entitled to recover attorney fees from the party who breached the contract unless that breaching party acted in bad faith, or in a vexatious, wanton, obdurate, or malicious manner.

Bad faith embraces more than bad judgment or negligence. It is marked by a dishonest or fraudulent purpose, amoral conduct, conscious wrongdoing, or the breach of a known duty through some ulterior motive or ill will. It also embraces actual intent to mislead or deceive another. There can be no finding of bad faith where the evidence reveals that a party was simply insisting upon its right to obtain a legal determination of the adequacy of its claim or defense.

To do something vexatiously is to do it with an intent to bother or to cause annoyance to another. To act wantonly is to intentionally behave without regard to what is right or just. To behave obdurately is to behave stubbornly with hardened feelings. A person is malicious if that person acts in a cruel and hurtful way that is intended to cause harm to another.

(T. 1617-1618).

{¶70} During the jury's deliberations, the jury inquired: "When is bad faith considered, one, during the formation of contract; two, during construction; three, during litigation; four, during or at trial?" (T. 1636). The trial court instructed:

    \* \* \* the bad faith issue mentioned on Page 12 of your jury instructions relates to the breach of contract claim raised by MCM against the Sheehans. When weighing whether the Sheehans acted in bad faith in connection with that breach of contract claim, your focus should not be on any actions by the Sheehans during the time when the contract was being drafted or while the parties were performing their duties under the contract. Your focus instead should be on any alleged breach of the contract by the Sheehans and on the litigation that ensued when MCM sought to recover damages for the alleged breach of contract. In weighing these matters, you may consider the Sheehans' words and actions during the litigation and at the trial.

(T. 1641-1642).

{¶71} The jury found in Interrogatory No. 2 that the Sheehans breached the contract on January 5, 2015. The jury affirmatively answered Interrogatory No. 4 that the Sheehans' conduct in breaching the contract was in bad faith or was vexatious, wanton, obdurate, or malicious. The Sheehans state that MCM's breach of contract argument was based on two premises: the Sheehans' failure to pay per the terms of the cost-plus contract and the Sheehans' termination of the contract in contravention of the terms of the cost-plus contract. The interrogatories did not inquire as to how the Sheehans breached the contract on January 5, 2015. We note the Sheehans do not raise as an Assignment of Error a challenge to the verdict that the Sheehans breached the cost-plus contract. The Sheehans' argument on appeal addresses only the bad faith element.

{¶72} The Sheehans argue the jury's verdict as to bad faith is not supported by competent, credible evidence. They first contend the jury could not have found that the Sheehans breached the contract in bad faith by their failure to pay by January 5, 2015, because on that date and thereafter, evidence was presented that MCM and the Sheehans were discussing how the alleged overage occurred, the nature of the overage, and the amount of the overage. The Sheehans point to the record where MCM filed a mechanic's lien alleging it was owed $66,205.70. In this complaint, however, it alleged it was owed $124,868.85. They could not be liable for failure to pay if they did not know how much to pay. The Sheehans next contend there was no evidence to support the conclusion that the Sheehans terminated the cost-plus contract in bad faith. At trial, evidence was presented that they felt MCM had done poor work and its attempt to address items on the punch list was making things worse.

{¶73} It is well-established that the trial court is in the best position to determine the credibility of witnesses. *See, e.g., In re Brown*, 9th Dist. Summit No. 21004, 2002–Ohio–3405, ¶ 9, citing *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212. Furthermore, a jury or factfinder can reject certain aspects of a witness's testimony; thus, "credibility is not an 'all or nothing' proposition." *State v. Cola*, 77 Ohio App.3d 448, 452, 602 N.E.2d 730, 733 (11th Dist.1991), citing *State v. Sallee*, 11th Dist. Ashtabula No. 90-A-1512, 1991 WL 132186. The witnesses in this case relevant to the issue of bad faith were Moldovan, Tammy Sheehan, and Mark Sheehan. Tammy and Mark Sheehan both testified Mark Sheehan sent the email to MCM on January 5, 2015 telling Moldovan not to return to the home to complete the punch list. The Sheehans denied the January 5, 2015 email was a termination. Moldovan testified he was attempting to address the items

on the punch list or have his subcontractors address the items on the punch list. As to the Sheehans' failure to pay, the evidence in this case showed that a majority of the budget overages and increased final costs were due to the choices made by the Sheehans in order to complete their custom-built dream home. The Sheehans testified they did not refer to the budget and assumed MCM would inform them when they went over budget. It was the Sheehans, not MCM, that met with the vendors, reviewed the finish options, and ultimately made the selections that caused overages. For example, in the case of the upgraded windows, the vendor's email to the Sheehans stated, "if you are trying to keep within a budget, these will blow it up." (T. 696-697).

{¶74} The jury was thoroughly instructed on the definitions of bad faith under Ohio law and it is presumed the jury followed the trial court's instructions. This case came down to a credibility determination between the witnesses and the jury ultimately found MCM more credible. We cannot say there was no competent, credible evidence to support the jury's verdict.

{¶75} The Sheehans' third Assignment of Error is overruled.

### C. Bad Faith – Attorney's Fees

{¶76} The Sheehans argue in their fourth Assignment of Error that the trial court erred in awarding attorney's fees to MCM based on the jury's finding of bad faith.

{¶77} The majority of the Sheehans' argument in this Assignment of Error contends the finding of bad faith was in error. As we stated in our analysis of the Sheehans' third Assignment of Error, we found there was competent, credible evidence to support the jury's determination that the Sheehans acted in bad faith. We further found the trial court's consideration of attorney's fees in this case was based on the breach of

contract exception to the American rule, not based on a tort-related breach of contract. In a breach of contract case each party is responsible for their own attorney fees except as otherwise provided for by statute or contract or when the opposing party acted in bad faith, vexatiously, wantonly, obdurately, for malicious reasons, or otherwise engaged in malicious conduct." *Strategy Group for Media, Inc. v. Lowden*, 5th Dist. Delaware No. 12 CAE 03 0016, 2013-Ohio-1330, ¶ 55, citing *Stambaugh v. T.C. Wood Realty, Inc.*, 5th Dist. Morrow No. 09 CA 00008, 2010-Ohio-3763, ¶ 36.

{¶78} In the trial court's September 6, 2018 judgment entry awarding attorney's fees to MCM, the trial court analyzes whether the Sheehans should be required to pay attorney's fees and if so, the proper amount of those fees. The trial court acknowledges the jury verdict on the issue of bad faith but states the issue of whether to award attorney's fees remains discretionary with the court. The trial court concludes that upon review of the record and the arguments of the parties, it accepts the jury's finding that the Sheehans acted in bad faith when they breached the contract and should be ordered to pay MCM's attorney's fees. In determining the amount of fees to award, the trial court considers that some of the fees were generated to defend against the Sheehans' counterclaims, deducting $9,175 from the award of attorney's fees.

{¶79} A determination of whether to award attorney fees and the amount of such fees is within the sound discretion of the trial court. Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court shall not interfere. *Polaris Owners Assn., Inc. v. Solomon Oil Co.*, 5th Dist. No. 14CAE110075, 2015-Ohio-4948, 50 N.E.3d 983, 2015 WL 7738185, ¶ 86. The trial court considered the issues raised

by the Sheehans. In this case, we can find no abuse of discretion to award attorney's fees based on the jury's finding and the trial court's secondary review of the bad faith issue.

{¶80} The Sheehans' fourth Assignment of Error is overruled.

### III. BREACH OF CONTRACT

{¶81} The Sheehans contend in their fifth Assignment of Error that the jury's verdict that MCM did not breach the terms of cost-plus contract was against the manifest weight of the evidence. We disagree.

{¶82} In *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, the Ohio Supreme Court clarified the standard of review appellate courts should apply when assessing the manifest weight of the evidence in a civil case. The Ohio Supreme Court held the standard of review for manifest weight of the evidence for criminal cases stated in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997) is also applicable in civil cases. *Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517. A reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.*; *see also Sheet Metal Workers Local Union No. 33 v. Sutton*, 5th Dist. Stark No. 2011 CA 00262, 2012-Ohio-3549, 2012 WL 3200846. "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley, supra*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517.

{¶83} As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. *Markel v. Wright*, 5th Dist. Coshocton No. 2013CA0004, 2013-Ohio-5274, 2013 WL 6228490. Further, "an appellate court should not substitute its judgment for that of the trial court when there exists * * * competent and credible evidence supporting the findings of fact and conclusion of law." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The underlying rationale for giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Id.* Accordingly, a trial court may believe all, part, or none of the testimony of any witness who appears before it. *Rogers v. Hill*, 124 Ohio App.3d 468, 706 N.E.2d 438 (4th Dist.1998).

{¶84} The question before the jury was whether MCM breached the cost-plus contract. "Ohio courts have held that the elements for a breach of contract are that a plaintiff must demonstrate by a preponderance of the evidence (1) that a contract existed, (2) that the plaintiff fulfilled his obligations, (3) that the defendant failed to fulfill his obligations, and (4) that damages resulted from this failure." *Moore v. Adams*, 5th Dist. Tuscarawas No. No.2007AP090066, 2008–Ohio–5953, ¶ 22.

{¶85} The Sheehans contended MCM breached the cost-plus contract by its failure to comply with Sec. 2.1, which states:

(ii) <u>Cost Control</u>. Develop and monitor an effective system of Project cost control and negotiate the best price possible for the Buyer. Revise and refine the initially approved Project Construction Budget, incorporate

approved changes as they occur, and develop cash flow reports and forecasts as needed. Identify variances between actual and budgeted or estimated costs and advise Buyer and Architect/Engineer whenever projected cost exceeds budgets or estimates. Maintain cost accounting records on authorized Work performed under unit costs, actual costs for labor and material, or other bases requiring accounting records.

{¶86} Moldovan testified that he did not amend his budget to reflect the increases in costs. (T. 457). The Sheehans contend that if MCM had followed the terms of the cost-plus contract, they would have been aware of the budget overages and would have adjusted their choices to stay within budget. Sec. 3.2 of the cost-plus contract required the Sheehans to be fully acquainted with the project and approve the construction budget. The evidence demonstrated the Sheehans met with the vendors, made the selections, and were aware of the costs of their selections.

{¶87} The jury instructions stated,

If you find by the greater weight of the evidence that MCM has failed to prove any part of its claim for breach of contract, or if you find that the Sheehans have proved by the greater weight of the evidence that MCM failed to substantially perform its duties under the contract, then you will find in favor of the Sheehans.

In this case, the jury determined the greater weight of the evidence showed MCM substantially fulfilled his obligations and the Sheehans did not fulfill their obligations. The competent, credible evidence in this case supports their conclusion.

{¶88} The Sheehans fifth Assignment of Error is overruled.

**CONCLUSION**

{¶89} The judgment of the Delaware County Court of Common Pleas is affirmed.

By: Delaney, J.,

Gwin, P.J. and

Wise, John, J., concur.