[Cite as *Waldock v. Waldock Invest. Co.*, 2025-Ohio-872.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

William L. Waldock

      Appellee

v.

Waldock Investment Company, et al.

      Appellants

Court of Appeals No.  E-24-021

Trial Court No.  2022 CV 0245


**DECISION AND JUDGMENT**

Decided:  March 14, 2025

* * * * *

Jeffrey A. Lipps, Jennifer A.L. Battle, and
Joshua S. Peterson, for appellee

Robert C. Tucker and Jeff M. Smith,
for appellant, Robert Waldock.

John A. Coppeler, for appellant, Waldock
Investment Company.

* * * * *

**OSOWIK, J.**

{¶ 1} William Waldock and Robert Waldock are brothers.  Each brother is a 50%
shareholder in Waldock Investment Co., a closely held corporation in the rental property
business.  In 2022, William Waldock, the plaintiff-appellee herein, filed a complaint in
the Erie County Court of Common Pleas, alleging that Robert Waldock and Waldock
Investment Co., the defendant-appellants herein, refused to provide him with access to

corporate records, in violation of Chapter 1701 of the Ohio Revised Code. Following cross motions for summary judgment and an evidentiary hearing, the trial court granted judgment, in part, to William Waldock, awarding him approximately $11,000 in forfeiture funds and $76,000 in attorney fees. We affirm.

## I. Background

{¶ 2} Waldock Investment Company ("WIC") was founded in 1969 by the brothers' late father who gradually transferred his interest in the business to his sons, whereby William and Robert ultimately became co-owners, in equal amounts. Robert actively ran the business and served as its president and treasurer. William served as vice-president and secretary but was not active in the "day-to-day" operations.

{¶ 3} Separately, Robert and William have also owned "16 or 17 different [limited liability companies]." For example, Robert has owned a number of "apartment companies" and an antique automobile company, and William has owned one or more "boating companies." The businesses were all "separate entities" from WIC.

{¶ 4} At hearing, Robert testified that, over the years, WIC made "advances" to himself and William for the purpose of "cover[ing] daily operation costs" of their various businesses. Robert described "advances" as "basically like a bar tab," that each brother benefited from for "decades." Although WIC operated with a "level of informality," advances were "kept track of" by the company's bookkeeper. WIC also employed a licensed accountant and an "outside" accounting firm.

2.

{¶ 5} On July 25, 2017, WIC "closed" as a "functional[ly] operat[ing]" business, after it sold its last two assets, both apartment buildings.

{¶ 6} More than three years later, in November of 2020, Robert authorized WIC to issue a check in the amount of $719,202, payable to himself. Robert notified William of the payment in an email, indicating that the "check was a repayment of the loan." At hearing, Robert further explained that the repayment to him was for monies that he advanced *to* WIC, when it "did not have money" to purchase an apartment building.

{¶ 7} On November 19, 2020, William objected to the payment in writing and demanded to see "the loan documents." Robert did not return the funds or "provide answers" to the letter. At trial, Robert testified that he did not know whether a formal loan document was ever prepared regarding his loan to WIC.

{¶ 8} William retained counsel and sent another letter to Robert and WIC, dated December 2, 2020. In the letter (hereinafter the "Shareholder Record Request"), William identified 15 categories of information, all of them pertaining to loans made by, and to, WIC. William requested "copies of" the following:

> (1) all loan documents,
> (2) all loan documents for all loans you called out in the schedules you have provided,
> (3) all loan support documents and data for which original loan documents are not available, including, but not limited to, dates, principal amounts, interest rates, amortization schedule, purpose for each loan and uses of the loan proceeds, actual repayment dates, source and amounts of monies used to pay WIC loans, support documents for loan repayment statements,
> (4) all loan details for monies loaned to and from WIC,
> (5) details for all loans by WIC to RLW or WLW,

3.

(6) detail for all loans made by WIC, to companies owned, controlled, or influenced by RLW or WLW,

(7) details for all loans made to WIC by companies owned, controlled, or influenced by RLW or WLW,

(8) details for all loans made by RLW or WLW to WIC,

(9) documentation for all loan repayments made using WIC monies,

(10) documentation for all loan repayments made using RLW or WLW monies,

(11) details for all loans with outside lenders (including, but not limited to Fifth Third and Civista Bank) to WIC, including the details on how the monthly mortgage payments were made and the source of the monies, as well as how they were reimbursed later if applicable,

(12) details for how each loan's principal was used, invested,

(13) All details on loan payment payment reimbursements made by WIC to Stockholders, for the time period covered by Exhibit A,

(14) All payment records showing when payments were made and/or received by the Company on such loans identified above, and in what amounts, and

(15) An accurate chronology for all loans and details.

{¶ 9} William indicated his intention to pursue all available remedies in court, in the event a response was not provided within 21 days. Neither Robert nor WIC responded to the Shareholder Record Request.

{¶ 10} Six months later, in May of 2021, Robert authorized a "cash payment" from WIC to himself, in the amount of $694,000. Robert described the payment as a shareholder "distribution to [himself]" and claimed that William received the same distribution "four [or] five years" earlier. William objected in writing to the "unauthorized distribution of WIC assets to [Robert]."

{¶ 11} On May 31, 2022, William filed a three-count complaint against Robert and WIC in the Erie County Court of Common Pleas. In Counts 1 and 2, William alleged that appellants wrongfully denied him "access to WIC's [books and] records" as well as

4.

"WIC's annual statements and financial opinions," in violation of R.C. 1701.37 and 1701.38, respectively. In Count 3, William claimed that, based upon those violations, Robert was subject to the forfeiture penalties set forth in R.C. 1701.94. In his prayer for relief, William sought injunctive relief, monetary sanctions and "for such other relief, legal or equitable. . . including an award of attorney fees and costs." William attached the Shareholder Records Request to the complaint.

{¶ 12} Four months after the complaint was filed, Robert assigned Mary Sherwood, a CPA who had worked for WIC, the task of gathering company records in response to William's discovery demand. Sherwood, who also testified at hearing, downloaded a "significant" amount of company data onto an external hard drive, which was described as "over [20] years worth of [WIC's] financial information," specifically "over 256 megabytes of [WIC] data, 1,006 files, and 112 file folders." On September 6, 2022, Robert dropped off the hard drive and placed it in William's mailbox. He did not review the contents of the hard drive beforehand.

{¶ 13} During the litigation, Robert moved the trial court for an advancement of funds and for indemnification from WIC to cover his legal expenses in defending himself in this case. According to his testimony, Robert incurred $213,000 in attorney fees, from the time the complaint was filed, when he retained separate counsel from WIC.

{¶ 14} The parties filed cross-motions for summary judgment as to all claims asserted in the complaint. William supported his motion with an affidavit from his own certified public accountant who attested that the hard drive "contains no loan documents,

5.

no sources and use statements, no amortization schedules, no interest rate term sheets, and no payments terms sheets." In other words, the hard drive contained no files or records that were responsive to William's Shareholder Record Request.

{¶ 15} In its August 8, 2023 judgment, the trial court found,

> While Defendants have provided a significant amount of documents to [William], the record . . . establishes that documents responsive to the specific requests (i.e. loan documentation) either [have not] been identified, [have not] been located or just [do not] exist. It is this last point that has protracted this dispute and is befuddling. . . While Defendants provided a lot of documentation on [a] hard drive, Defendants never identified where on the hard drive any responsive documentation can be located and Plaintiff attests there is no loan documentation on the hard drive.

{¶ 16} The trial court granted William judgment as to Count 1, finding that he made a "proper written demand for loan documentation" and that he "had a legitimate proper purpose" under R.C. 1701.37(C). However, it denied him judgment as to Count 2, finding that the "timing of" William's demand for loan documents did not trigger a duty by appellants under R.C. 1701.38, which governs a corporation's "annual financial statements."

{¶ 17} In light of the judgment in William's favor as to Count 1, the court found that he was entitled to "statutory penalties" under R.C. 1701.94 (Count 3). However, because William failed to provide a "break out" of attorney fees and statutory forfeitures, the court ordered an evidentiary hearing to determine whether William was entitled to attorney fees—i.e. whether there was "Bad Faith [by] Defendants"—and if so, to determine the appropriate amount. The trial court further ordered appellants to "produce the requested loan documents as soon as practicable, but no later than ninety (90)

6.

Business days from the date this Judgment Entry is filed" *and* to provide "at that time a written response to the request for loan documents" to William's counsel. Finally, the court ruled that Robert's pending motion for advancement of fees and indemnification would be addressed at the hearing.

{¶ 18} Following a two-day hearing and the parties' written closing arguments, the trial court issued detailed findings of fact and conclusions of law on March 22, 2024. The court found that William was entitled to attorney fees in the amount of $76,262.50, to be paid by Robert and WIC, and to a forfeiture award in the amount of $10,970, to be paid by Robert. The court denied Robert's request for advancement and indemnification. Appellants appealed.

{¶ 19} WIC raises the following assignments of error for our review:

> I. The trial court erred in awarding attorney fees to plaintiff-appellee based on a finding that Appellants acted in bad faith in failing to provide books and records to plaintiff.

> II. The trial court erred in awarding attorney fees to plaintiff-appellee where there was a lack of evidence presented regarding the reasonableness and necessity of the amount of fees awarded.

**{¶ 20}** Robert raises the following assignments of error:

ASSIGNMENT OF ERROR 1: The trial court erred when it granted summary judgment in Plaintiff-Appellee's favor on the issue of corporate forfeiture predicated on a violation of R.C. 1701.37(C).

ASSIGNMENT OF ERROR 2: The trial court erred when it denied Defendant-Appellant's motion for indemnification, contrary to the plain language of Waldock Investment Company's Code of Regulations.

ASSIGNMENT OF ERROR 3: The trial court erred when it awarded Plaintiff-Appellee "bad faith" attorney fees without being asked to do so, without identifying the conduct that constituted bad faith, without applying the correct standard, and without sufficient evidence to support such a finding.

## II. Attorney Fees

**{¶ 21}** We address the issue of attorney fees first. Attorney fees are available in limited circumstances. As explained by the Ohio Supreme Court in *Wilborn v. Bank One Corp,* 2009-Ohio-306, ¶ 7:

> Ohio has long adhered to the "American rule" with respect to recovery of attorney fees: a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation. *Nottingdale Homeowners' Assn., Inc. v. Darby*, 33 Ohio St.3d 32, 33–34 (1987); *State ex rel. Beebe v. Cowley*, 116 Ohio St. 377, 382 (1927). However, there are exceptions to this rule. Attorney fees may be awarded when a statute or an enforceable contract specifically provides for the losing party to pay the prevailing party's attorney fees, *Nottingdale* at 34, or when the prevailing

8.

party demonstrates bad faith on the part of the unsuccessful litigant.  *Pegan v. Crawmer*, 79 Ohio St.3d 155, 156 (1997).

{¶ 22} Additionally, attorney fees may also be awarded as an element of compensatory damages if punitive damages are awarded.  *Zoppo v. Homestead Ins. Co.,* 71 Ohio St.3d 552, 558 (1994).

{¶ 23} As the trial court correctly found, William's statutory claim under R.C. 1701.37 does not provide for attorney fees.  *Accord, Bodenstein v. Richard Aloisio Trucking, Inc.,* 2020-Ohio-3761, ¶ 26 (12th Dist.) ("R.C. 1701.37. . . contains no attorney fee-shifting provision.").  Likewise, the record discloses no contract provision authorizing attorney fees, and the trial court did not award William any punitive damages.  Accordingly, to recover his attorney fees, William "had to establish that appellants acted in bad faith."  *No-Burn v. Murati,* 2011-Ohio-5635, ¶ 57 (9th Dist.) (Dickinson, J., concurring).

{¶ 24} Appellants raise several challenges to the trial court's attorney fee award. We first address their claim that the very issue of attorney fees was not properly before the trial court because William "never alleged in his Complaint that [Robert] or WIC acted in bad faith."  Instead, according to appellants, the trial court "*sua sponte*" raised the issue of bad-faith on William's behalf and then granted him relief "that was never requested."   In his reply memorandum, Robert adds that "bad faith claims must be pleaded in the complaint" and that merely including a request for "attorney fees" in a prayer for relief—as William did—is "not enough" to raise a claim of bad faith.  *See, e.g. Thomason v. Hamilton,* 2008-Ohio-3492, ¶ 10 (2d Dist.) (Trial court erred in awarding

9.

attorney fees to plaintiff where complaint "contains [no] allegation of bad faith on the part of [the defendant]."

{¶ 25} We decline to address the merits of appellants' argument because they failed to raise the issue below, specifically at the evidentiary hearing—when the issue of attorney fees was litigated—*or* in their post-hearing briefs. When reviewing arguments on appeal, we cannot consider issues that are raised for the first time on appeal. "[R]eviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed." *Goldberg v. Indus. Comm.,* 131 Ohio St. 399, 404 (1936) (Noting that subject matter jurisdiction may be raised at any time). Indeed, it is well-established that "an appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Williams,* 51 Ohio St.2d 112, 117 (1997). By failing to raise the argument in the trial court—that William's complaint did not articulate a bad faith claim, thereby precluding an award of attorney fees—appellants forfeited their right to raise this argument on appeal. *Accord Carnegie Cos., Inc. v. Summit Properties, Inc.,* 2012-Ohio-1324, ¶ 10 (9th Dist.) ("By failing to raise any argument before the trial court that Carnegie had failed to allege bad faith so that Summit had no notice of its need to defend against such a claim, Summit forfeited its right to raise this argument for the first time on appeal.").

10.

**A. The trial court did not abuse its discretion in awarding attorney fees to William.**

{¶ 26} We review a trial court's determination "with respect to a request for attorney fees on the basis of bad faith for an abuse of discretion." *Bodenstein v. Richard Aloisio Trucking, Inc.,* 2020-Ohio-3761, ¶ 25 (12th Dist.). "An abuse of discretion is more than an error of law or judgment. It implies an attitude on the part of the court that is unreasonable, arbitrary, or unconscionable." (Citation omitted.) *State ex rel. Beacon J. Pub. Co. v. Akron Metro. Hous. Auth.,* 42 Ohio St.3d 1, 2–3 (1989) (Affirming lower court's decision to deny attorney fees under R.C. 149.43(A)(1) where it found "no evidence of bad faith" based, in part, on non-prevailing party's "attempt[] to resolve th[e] dispute through compromise."). "When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court." *Jeter v. Kruz 'N' Kleen,* 2023-Ohio-4165, ¶ 11 (6th Dist.), quoting *In re Trust of Tary v. Seiple,* 2022-Ohio-3773, ¶ 21 (6th Dist.) (Finding no basis for "interference" with the trial court's attorney fee award).

{¶ 27} In this case, following an evidentiary hearing, the trial court determined that William was entitled to attorney fees based upon its finding of "Bad Faith [by appellants]." Bad faith has been defined as "a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud [or an] actual intent to mislead or deceive." *State ex rel. Cleveland Assn. of Rescue Emps. v. The City of Cleveland*, 2023-Ohio-3112, ¶ 32, quoting *Slater v. Motorists Mut. Ins. Co.*, 174 Ohio St. 148 (1962), paragraph two of the

11.

syllabus, *overruled on other grounds by Zoppo,* 71 Ohio St.3d 552. Bad faith can involve conduct during litigation and conduct giving rise to a party's claim. *Becker v. Direct Energy, L.P.,* 2018-Ohio-4134, ¶ 109 (2d Dist.).

{¶ 28} Appellants dispute the trial court's bad faith determination. We apply a civil manifest weight of the evidence standard when reviewing a finding of bad faith. *See, e.g., Carnegie Companies,* 2012-Ohio-1324, at ¶ 16 (9th Dist.) (Finding competent, credible evidence to support trial court's finding that law firm acted in bad faith); *but see, Watershed Mgt., L.L.C. v. Neff,* 2012-Ohio-1020, ¶ 52 (4th Dist.) ("When reviewing whether bad faith exists to justify an award of attorney fees, some appellate courts have made this finding without enunciating a clear standard of review."). "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Const. Co.,* 54 Ohio St.2d 279 (1978), syllabus.

{¶ 29} First, Robert claims that the trial court failed to "identify any specific conduct that constituted [bad faith]."

{¶ 30} We find that the opposite is true. That is, the trial court found that the following "actions/inactions" by Robert and WIC "were done in bad faith:"

- Appellants "did not respond" to Williams' informal letter in November of 2020 which demanded to see loan documents and raised "concern[s]" regarding Robert's "taking $719,000" from WIC.

- Appellants "took [no] actions" in response to William's December 2, 2020 Shareholder Record Request. For example,

they "never made arrangements for [William] to see the records/documents."

- Robert "[took] another significant amount of money [i.e. $694,000] intentionally - - or at least recklessly" in May of 2021.

- In May of 2022, after William filed the instant lawsuit, Robert provided William with a "records dump." The records were compiled by someone else, Robert "never looked at the[m]," and the records provided no "answers" in response to Williams' records request.

- At the evidentiary hearing, Robert was "elusive, non-committal and/or evasive." A "good portion" of his responses were "littered" with "'I don't know' or 'I can't recall' answers'" which "further delayed getting to. . . the truth of the situation."

- Appellants failed to comply with the court's August 8, 2023 order to "produce the loan documents" *and* failed to provide a "written response to [William's] counsel" within 90 days. After the 90-day deadline had passed, appellants told Williams that "neither [appellant] had the records/documents he sought."

- Robert exercised more than "just. . . bad judgment." Rather, he acted with "ill will" and "demonstrated [that] his ulterior motive . . . was to mislead or deceive [William] regarding the loans and loan repayments he made to himself by not producing the supporting records or documents requested by [William]."

- As for WIC, after it secured separate counsel and observed Robert's conduct, it "should have stepped up to the plate." Instead, it allowed Robert to "be the driving force."

{¶ 31} The trial court concluded that appellants, by engaging in "delay tactics" and "smoke screens" turned a "simple Records Request" into a "very timely and labor intensive" exercise to obtain documents that "just [don't] exist."

{¶ 32} We find, contrary to Robert's argument, that the trial court identified specific conduct in support of its finding that appellants engaged in bad faith. Moreover,

13.

based upon our review of the record, there was competent, credible evidence to support that determination. According to the evidence, appellants ignored multiple demands for information, including two written demands, the filing of the complaint, and even a court order. Further, the information that appellants did finally provide came by way of a data "dump" that Robert did not personally review *and* that was not responsive to William's request. Indeed, it was not until *after* the trial court's deadline had passed—and nearly three years after William made his first request for loan documents—that appellants admitted that no such documentation existed. This, despite the fact that Robert authorized another "significant" payment to himself, with full knowledge that William had requested information for any and all loans *and* had objected to the prior loan payment. These are not "unidentified" behaviors, as alleged by Robert. Whether or not they constitute bad faith is the subject of appellants' next challenge.

{¶ 33} Robert takes issue with the trial court's finding that he breached "his known fiduciary duty of loyalty" as president and treasurer of WIC. Moreover, he insists that a breach of a fiduciary duty "is not equivalent to bad faith" and "is not enough" because bad faith "embraces actual intent to mislead or deceive." Robert cites no legal authority to support his position. For the record though, we note that "Ohio courts have awarded attorney fees in cases of a breach of fiduciary duty, construing such a breach to rise to the level of bad faith." *Ivancic v. Enos*, 2012-Ohio-3639, ¶ 73 (11th Dist.), citing *Mauger v. Inner Circle Condo. Owners Assn.,* 2011-Ohio-1533, ¶ 24-25 (9th Dist.) (upholding the trial court's award of attorney fees based on the existence of competent,

14.

credible evidence that the defendant had engaged in self-dealing that violated the company's by-laws and 'his duty not to act in bad faith'"). Further, the trial court specifically found that Robert breached his fiduciary duty because his intention was to "*mislead or deceive*" William about "the loans and loan repayments [that] he made to himself." (Emphasis added.) The court's harsh critique of Robert's conduct—which included findings that Robert "abdicated his responsibilities" as an officer and that he engaged in "subterfuge"—establishes that it was fully aware that a finding of bad faith requires more than mere bad judgment or negligence.

{¶ 34} Finally, WIC complains that the trial court's finding of bad faith is "inexplicable" given that WIC had "ceased" operating in 2017 and lacked personnel to respond to William' s voluminous request for documents. We reject WIC's argument. First, the company was still transacting business four years later, as evidenced by its two payments to Robert in 2020 and 2021. That same argument was also specifically rejected in *McConnell v. Bare Label Prods., Inc.* 2015-Ohio-1206, ¶ 36 (11th Dist.) where the court of appeals reversed a lower court's finding that it would be "unreasonable and unjust" to award forfeiture fees under R.C. 1701.94 against an officer of a corporation that is "now dissolved." The court of appeals determined that "absol[ving]" an officer from his statutorily-imposed record keeping requirements would "only encourage corporate officers, who have failed to maintain records, to resist efforts to examine records." *Id.* We agree. And, based upon our review of the record, we find competent, credible evidence to support the trial court's finding that appellants acted in bad faith.

15.

Accordingly, we find Robert's third assignment of error and WIC's first assignment of error not well-taken.

**B**. **The trial court did not abuse its discretion in calculating its attorney fee award.**

{¶ 35} In its second assignment of error, WIC argues that William failed to carry his burden of proof to sustain his request for attorney fees.  As with the determination of whether to award attorney fees, the amount of such fees is also reviewed for an abuse of discretion.  *MCM Home Builders, LLC v. Sheehan,* 2019-Ohio-3899, ¶ 79 (5th Dist.).

{¶ 36} The Ohio Supreme Court embraces a "lodestar" approach to attorney fee awards, under which "the starting point for determining attorney fees is . . . '"the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."'" *Phoenix Lighting Group, LLC v. Genlyte Thomas Group, LLC*, 2020-Ohio-1056, ¶ 10, quoting *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 145 (1991), quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  A reasonable hourly rate reflects the "prevailing market rate in the relevant community, given the complexity of the issues and the experiences of the attorney." (Internal citation omitted.)  *Id.* at ¶ 11, quoting *State ex rel. Harris v. Rubino*, 2018-Ohio-5109, ¶ 4.  A trial court may benchmark a reasonable rate "against rates recently approved for equally experienced attorneys in comparably complex cases."  *Rubino* at ¶ 4.

{¶ 37} In support of his request for attorney fees, William submitted an affidavit from his counsel and an attached eight-page spreadsheet "containing selected billing invoice entries related to the December 2, 2020 Records Request. . . and subsequent

16.

efforts to secure compliance with the Request." According to the affidavit, the "hours worked were billed at [counsel's and his colleague's] customary hourly rates" and covered the time period between December 2, 2020 and June 30, 2023. The total amount of fees incurred during that time period, and for those services, was $76,262.50, which the trial court granted, in full. In its decision, the trial court compared William's request for $76,000 in attorney fees to Robert's request for $213,000 (by way of indemnification). It noted that Robert sought a significantly greater amount for a "shorter time period of representation," further supporting the "reasonableness" of William's request.

{¶ 38} On appeal, WIC does not challenge the reasonableness of the hourly rate or the time spent by the time-keepers identified in the spread sheet. Instead, WIC argues that the evidence submitted by William is insufficient, as a matter of law, to sustain the award. Once again, however, because WIC failed to challenge the sufficiency of the evidence at trial, it has waived the argument on appeal.

{¶ 39} In its post-hearing brief, WIC argued that William failed to establish that Robert or the company had acted in bad faith and therefore "no attorney fees should be awarded to him." *See* 12/29/2023 "Final Argument of Waldock Investment Company" at 3. However, with regard to the reasonableness of the fees, WIC explicitly waived any challenge, asserting that, "[n]o challenge to the adequacy of the presentation by plaintiff on the attorney fee claim is needed, such as the lack of expert testimony on the reasonableness and necessity and customary fees charged is moot. [Sic]." *Id.* As

17.

previously discussed herein, by failing to present this argument to the trial court, WIC forfeited its right to argue it on appeal. *Carnegie Cos., Inc.,* 2012-Ohio-1324, at ¶ 10 (9th Dist.).

{¶ 40} For the record, we also find the merits of WIC's arguments not well-taken. WIC cites *Booth v. Copeco, Inc.,* 2019-Ohio-5361, ¶ 5 for the proposition that "[m]erely submitting an attorney's itemized bill is insufficient to establish the reasonableness of the amount of work billed." WIC omits other relevant passages from *Booth,* wherein we held,

> The moving party must submit the attorney's detailed bill indicating the time expended on each matter. But, the bill alone cannot support a finding of reasonableness. *The reasonableness of both the hours expended and the hourly fee must be proven through the billing attorney's testimony or affidavit and/or independent, unbiased evidence.* While expert evidence is not required to establish that the fees were reasonable and necessary, the lack of independent, expert evidence may impact the weight of the evidence. (Citations omitted; emphasis added.) *Booth* at ¶ 5 (Interpreting a statutory claim for attorney fees under R.C. 1335.11(D)).

{¶ 41} Here, the billing record, i.e. spreadsheet, was accompanied by an affidavit from the billing attorney, and under *Booth,* this was acceptable. While WIC was free to challenge the weight of that evidence, it did not do so. Either way, the evidence submitted by William was legally sufficient to support an award of attorney fees.

{¶ 42} WIC also claims that the trial judge—by relying on his own "experience and analysis" in fashioning the award—acted "beyond permissible bounds," according to "much case law." WIC fails to identify *any* case law, and we are not aware of authority that a trial court abuses its discretion when it relies upon its own "working knowledge of

18.

customary fees in this locality for legal services," as the court did in this case. Accordingly, we find WIC's second assignment of error not well-taken.

{¶ 43} We review the trial court's decision to award attorney fees for an abuse of discretion. *Jeter v. Kruz 'N' Kleen,* 2023-Ohio-4165, ¶ 11. This is a deferential review and does not allow us to substitute our judgment for that of the trial court. *Id.* After reviewing the decision, we find no abuse of discretion by the trial court in determining that Robert and WIC acted in bad faith or that William was entitled to attorney fees.

### III.  Forfeiture

{¶ 44} In his first assignment of error, Robert challenges the trial court's statutory forfeiture award.

{¶ 45} Under R.C. 1701.94(A), "[e]very corporation" that fails to comply with the following "shall be subject to forfeiture [penalties]:"

> (1) *Keep the books of account, minutes of proceedings, or records of shareholders as required by section 1701.37 of the Revised Code*;
>
> (2) Comply with division (C) of section 1701.11 of the Revised Code with respect to mailing a copy of an amendment to, or copy of new, regulations;
>
> (3) Perform the obligation imposed on it by division (C) of section 1701.25 of the Revised Code;
>
> (4) Send to any shareholder making written request therefor, within the period provided for in division (C) of section 1701.38 of the Revised Code, a copy of any financial statement, written statement, or report, as applicable, referred to in that section;
>
> (5) Lay before the shareholders or make available in the manner provided for in division (D) of section 1701.38 of the Revised Code at a proper meeting of shareholders, upon request of any shareholder at such

meeting, such financial statement, written statement, or report, as applicable;

(6) Produce at a meeting of shareholders, upon request of any shareholder at such meeting, the list or lists of shareholders required by section 1701.37 of the Revised Code; *shall be subject to [the] forfeiture [penalties set forth herein].* (Emphasis added.)

{¶ 46} The duties and forfeiture penalties set forth above also apply to "any officer" of the corporation. R.C. 1701.94(B). As noted by the trial court, William's forfeiture claim was brought against Robert "only," not WIC.

{¶ 47} In its decision, the trial court found that Robert was subject to the forfeiture statute because he violated R.C. 1701.37(C), i.e. by denying William "the right to examine. . . and to make copies" of WIC's books and records.

{¶ 48} On appeal, Robert does not challenge the underlying claim, i.e. that he violated R.C. 1701.37(C)—which was the subject of Count 1 of the complaint. However, he does challenge the trial court's conclusion, that his violation of R.C. 1701.37(C) triggered R.C. 1701.94, thereby subjecting him to a forfeiture award—which was the subject of Count 3 of the complaint.

{¶ 49} According to Robert, R.C. 1701.94 provides six "instances" in which forfeiture is available, and a violation of Section 1707.37(C) "is not one of them." R.C. 1701.37 ("Books, records of account, minutes of proceedings, and shareholders records") provides, in part,

(A) *Each corporation shall keep correct and complete books and records of account,* together with minutes of the proceedings of its incorporators, shareholders, directors, and committees of the directors, and records of its shareholders showing their names and addresses and the

20.

number and class of shares issued or transferred of record to or by them from time to time. . .

(C) *Any shareholder of the corporation*, upon written demand stating the specific purpose thereof, *shall have the right to examine* in person or by agent or attorney at any reasonable time and for any reasonable and proper purpose, the articles of the corporation, its regulations, *its books and records of account*, minutes, and records of shareholders aforesaid, and voting trust agreements, if any, on file with the corporation, *and to make copies or extracts thereof. . .*

{¶ 50} While Robert acknowledges that the forfeiture statute applies generally to "section 1701.37 of the Ohio Revised Code," he insists that it *excludes* from its reach violations of Subsection (C). *See* R.C. 1701.94(A)(1). Conversely (and curiously), he also claims that the forfeiture statute *includes* violations of Subsection (A). However, Robert maintains that he did not violate that section, i.e. that he did not "fail to keep correct and complete books." We disagree with both arguments.

{¶ 51} First, the trial court specifically found that the loan documents sought by William "just [don't] exist," which is tantamount to a violation of R.C. 1701.37(A). *McConnell* at ¶ 36 ("The [trial] court's conclusion that the records "likely. . . did not exist" confirms the violation of [R.C. 1701.37(A)]."). And, Robert concedes that a violation of R.C. 1701.37(A) triggers the forfeiture statute. Setting aside that violation, however, we also find that Robert's violation of R.C. 1701.37(C), i.e. Robert's failure to allow William the "right to examine . . . and to make copies or extracts" of WIC's book and records, also subjected him to forfeiture.

{¶ 52} First, Subsection (A)(1) of the forfeiture statute, applies broadly to violations of "section 1701.37," without reference to any specific subsection.

21.

Furthermore, the title of the forfeiture statute, which is "Failure to maintain or *provide records;* forfeiture" lends further support to our conclusion that the forfeiture statute includes within its scope violations of R.C. 1701.37(C). (Emphasis added.) In other words, failing to "keep" records, under R.C. 1701.37(A), *and* failing to allow a shareholder the right to "examine" and "make copies" of records, under R.C. 1701.37(C), subject the corporation or officer to a forfeiture award under R.C. 1701.94(A)(1). Case law supports our conclusion that "[t]he failure to comply with R.C. 1701.37(C) subjects the corporate officer to whom a demand is made 'to a forfeiture [under R.C. 1701.94].'" *McConnell v. Bare Label Prods., Inc.,* 2015-Ohio-1206, ¶ 34 (11th Dist.), *reaffirmed* 2017-Ohio-9325, quoting R.C. 1701.94(B); *accord Caruso v. Leneghan,* 2014-Ohio-1824, ¶ 86-88 (Affirming trial court's award of "statutory damages [award] for [defendants'] failure to comply with disclosure requirements under R.C. 1701.37(C)."); *see also* 12 Ohio Jur. 3d Business Relationships § 589, citing R.C. 1701.94(B) ("[I]f any officer charged with the duty to *provide corporate records* fails to perform such duty after written request by any shareholder, such officer is subject to a monetary forfeiture as provided by statute.") (Emphasis added.).

{¶ 53} For these reasons, we find that the trial court did not err in its determination that Robert, as an officer of WIC, was subject to the forfeiture provision set forth in R.C. 1701.94, for his violation of R.C. 1701.37(C). Therefore, because Robert does not challenge the trial court's forfeiture calculation of "$10,970 owed by [Robert]," we find Robert's first assignment of error not well-taken.

22.

## IV. Indemnification

**{¶ 54}** In his second assignment of error, Robert argues that the trial court erred in denying his "request" for indemnification from WIC for his expenses in defending himself in the instant case.[1]  In this case, Robert requested indemnification for his legal fees in defending himself from the instant case, in the amount of $213,000.

**{¶ 55}** "Ohio law does not require corporations to provide indemnification. . . :  it just gives them the power to do so." *Westbrook v. Swiatek,* 2010-Ohio-2868, ¶ 25-26 (5th Dist.) citing R.C. 1701.13(E)(2).

**{¶ 56}** "Indemnity arises from contract, either express or implied, and it is the right of a person, who has been compelled to pay what another should have paid, to require complete reimbursement." *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238, 240 (1987).  Contractual indemnification arises from a contract between the parties in which the indemnitor promises to indemnify the indemnitee against liability for circumstances stated in the contract. *Id.* at 240.  And the nature of the indemnity relationship is determined by the intent of the parties, as expressed by the language used in the contract. *Id.* When the indemnitor expressly agrees to indemnify an indemnitee, the

---

[1] We note the absence of any pleading in this case on the issue of indemnification.  *See, e.g. Kendall v. U.S. Dismantling Co.,* 20 Ohio St.3d 61, 61 (1985) ("Appellant filed a cross-claim for indemnification against appellee based upon an indemnity agreement in their contract.")  Instead, Robert requested indemnification by way of a motion, filed jointly by Robert and WIC.  *See* Defendants' Joint Reply, filed 2/3/2023.  WIC took no position on the issue, separate and apart from Robert, and it has not raised the issue on appeal.  However, William did contest Robert's request for indemnification and has briefed the issue.

23.

indemnitor is obligated to indemnify the indemnitee under the terms of the contract. *Allen v. Std. Oil Co.*, 2 Ohio St.3d 122 (1982), paragraph one of the syllabus. Thus, the issue before us is the contractual interpretation of the indemnification provision as set forth in the corporate regulations. *Accord, Westbrook* at ¶ 28.

{¶ 57} ARTICLE VII of WIC's Code of Regulations provides, in part, that

> Each present and future director and officer of the Company. . . shall be indemnified against any costs and expenses which may be imposed on or reasonably incurred by him in connection with any claim, action, suit, or proceeding hereafter made or instituted in which he may be involved by reason of his being or having been a director or officer of the Company . . . *The Company shall not, however, indemnify such director or officer with respect to matters as to which he shall be finally adjudged in any such action, suit, or proceeding to be liable because of dereliction in the performance of his duties as such director or officer* . . . (Emphasis added.)

{¶ 58} Here, the trial court began its analysis with the term "dereliction of duty," noting that it is defined in "various, but similar ways," including the following: "the intentional or careless failure to carry out one's responsibilities, or doing so inadequately" (Justia Legal Dictionary); "intentional or conscious neglect" (Merriam Webster Dictionary); "forsaking or failure in duty or reprehensible neglect which has or could have serious consequences for the company" (Law Insider); and "failure to do what you should do" (Cambridge Dictionary).

{¶ 59} The court determined that Robert was derelict in his duties for "intentionally or with conscious neglect and/or carelessly" failing to carry out his responsibilities as president and treasurer of WIC which "led to serious legal and financial consequences for WIC." It specifically found that Robert "failed to abide by the

24.

by-laws" or to "perform the duties [placed upon] him in his capacity as president and [treasurer]."[2] The court determined that Robert was derelict in his duties as an officer of the corporation, and therefore, he was not entitled to indemnification under Article VII of WIC's Code of Regulations.

{¶ 60} On appeal, Robert argues that the trial court "misinterpreted" WIC's code of regulations. He claims that he could not be denied indemnification unless he was found liable "because" he was derelict in his duties and here, the trial court failed to establish a causal relationship between his "liability" and a "dereliction of his duties." Elsewhere, he claims that the trial court "certainly did *not* find that [William] was entitled to forfeiture 'because of [Robert's] dereliction in the performance of his duties.'" (Emphasis added.).

{¶ 61} But, that is exactly what the court found. That is, it specifically found that Robert's failure to carry out his responsibilities as an officer of WIC "*led to* serious legal and financial consequences for WIC." (Emphasis added.). Indeed, the court found that Robert's failure to comply with William's shareholder record request, under R.C. 1701.37, "caused. . . financial harm to WIC."

{¶ 62} We find Robert's second assignment of error, challenging the trial court's decision to deny his request for indemnification, not well-taken.

---

[2] The trial court mistakenly referred to Robert as WIC's president and secretary, but the record establishes that he served as the company's president and treasurer.

25.

## V. Conclusion

{¶ 63} Appellants' assignments of error are overruled, and the March 22, 2024 judgment of the Erie County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Gene A. Zmuda, J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.